Harold METTS, Jean Wiggins, Bryan Evans, Stephanie Cruz, Urban League of Rhode Island, NAACP–Providence, and Black American Citizens Political Action Committee, Plaintiffs,

v.

Governor Lincoln ALMOND, Senate Majority Leader William Irons, Speaker of The House of Representatives John Harwood, Secretary of State Edward Inman III, and State Board of Elections Chairman Roger Begin, Defendants.

C.A. No. 02–204T.

United States District Court, D. Rhode Island.

Sept. 9, 2002.

■■■■■■■■

Bruce G. Pollock, West Warwick, RI, Anita S. Hodgkiss, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Bryan J. Wilson, Sunil R. Kulkarni, Morrison & Foerster LLP, Palo Alto, CA, for plaintiff.

John A. Tarantino, Adler, Pollock & Sheehan, Inc., Normand G. Benoit, Brian J. Spero, Eugene G. Bernardo, II, Partridge, Snow & Hahn LLP, Raymond A. Marcaccio, Thomas A. Palombo, Richard B. Woolley, Victoria Almeida, Patricia K. Rocha, Adler Pollock & Sheehan, Providence, RI, H. Reed Witherby, Esq., Smith & Duggan LLP, Boston, MA, for defendant.

## *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

The plaintiffs brought this action pursuant to Section 2 of the Voting Rights Act of 1965, as amended ("Section 2" or the "VRA"), 42 U.S.C. § 1973 claiming that, the redistricting plan adopted by the State of Rhode Island, (the "Plan") "has the effect of denying black voters an equal opportunity to elect candidates of their choice to the senate." Am. Compl. ¶ 31. They allege that, under the Plan, the percentage of African–Americans residing in State Senate District 2 is less than 26% which is the percentage of African–Americans who resided in former District 9 which, also, is the percentage that would enable "an African–American candidate preferred by African–American voters ... [to] win [an] election in an influence district that is less than 50% African–American in population." Am. Compl. ¶¶ 13–14, 27.

The defendants have moved to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), on the ground that, because the complaint does not allege that it is possible to draw district boundaries in a manner that would make African–Americans a majority, it fails to satisfy one of the preconditions for a Section 2 claim established by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

The principal issue presented is whether a group whose members constitute less than a majority of the population in a proposed voting district but who claim the ability to "elect" or "influence" the election of candidates can maintain an action for a violation of Section 2 on the ground that the plan denies members of the group the opportunity "to elect representatives of their choice."

Because I answer that question in the negative, the motion to dismiss is GRANTED.

### *Background*

In February 2002, the Rhode Island General Assembly adopted a redistricting plan (the "Plan") that, among other things, revised the boundaries of the State's senatorial districts. The Plan was adopted in response to the results of the 2000 census and an amendment to the Rhode Island Constitution reducing the number of senatorial districts from 50 to 38.

The plaintiffs commenced this action on May 2, 2002. The individual plaintiffs are several African–American voters who reside in what formerly was the State Senate District 9 and/or what is the newly-created District 2 which, apparently, encompasses part or all of former District 9. They are joined by various organizations that promote the interests of African–American voters and support political candidates who

serve the interests of the African–American community.

The amended complaint alleges that the population of former District 9 was 25.69% African–American and 41.08% Hispanic and that the population of newly-created District 2 is only 21.42% African–American and 46.74% Hispanic. Am. Compl. ¶¶ 13–14. The amended complaint does not state whether the remaining 33.23% of the population of former District 9 or the remaining 31.84% of the population of District 2 includes any other racial minority groups.

The amended complaint also alleges that, although African–American voters are a politically-cohesive group, they "are not politically cohesive with voters in the Hispanic or white communities." Am. Compl. ¶¶ 26–27. In fact, it states that Hispanics, along with whites, usually vote, in a bloc, against the candidates preferred by African–American voters. Am. Compl. ¶ 28.

However, the amended complaint further alleges that, with the help of white and Hispanic crossover voters, "an African–American candidate preferred by African–American voters ... can win election in an *influence* district that is less than 50% African–American in population" (Am. Compl. ¶ 27 (emphasis added)) but not less than 26% (Am.Compl.¶ 28) and that it is possible to create such a district (Am. Compl.¶ 24).

In essence, the plaintiffs claim that the Plan violates Section 2 of the VRA because, by creating a district in which the percentage of African–Americans is less than 26%, it "has the effect of denying black voters an equal opportunity to elect candidates of their choice to the senate." Am. Compl. ¶ 31.

### Standard of Review

A Rule 12(b)(6) motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In assessing the sufficiency of a complaint, the Court must "accept the well-pleaded factual averments of the ... complaint as true, and construe these facts in the light most flattering" to the plaintiff. *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988) (quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir.1987)).

However, the facts alleged must be sufficient to establish all of the elements of the claim asserted. *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.,* 246 F.3d 1 (1st Cir.2001); *Gooley,* 851 F.2d at 515. Bald assertions, subjective characterizations, and legal conclusions are insufficient. *United States v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir. 1992); *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

### Analysis

The Supreme Court has said that " 're-apportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.'" *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (quoting *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975)); *see also Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."). Of course, that does not mean that state legislatures are free to draw voting district boundaries in any way that they please. What it does mean is that principles of federalism counsel that federal courts should not interject themselves into the process unless a proposed plan

violates a federal statute or constitutional right.

## I. *Section 2 of the VRA*

In this case, the plaintiffs allege that the Plan violates Section 2 of the VRA which, prohibits practices or procedures that deny or abridge a citizen's right "to vote on account of race or color." 42 U.S.C. § 1973(a). The statute provides that:

A violation of [Section 2] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

■ Section 2 prohibits practices such as literacy tests that discriminate against members of a racial minority group by selectively preventing them from voting or otherwise participating in the political process. *See Shaw v. Reno*, 509 U.S. 630, 640–641, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Section 2 also prohibits a state from configuring voting district lines in a way that dilutes the voting strength of a racial minority group and denies its members the same opportunity to elect candidates of their choice that other groups enjoy. *See id.* at 641, 113 S.Ct. 2816; *Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).

■ In determining whether a districting plan violates Section 2, the critical inquiry is whether it results in a "lack of

*equal electoral opportunity." Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir.1995) (emphasis added). Thus, Section 2 does not guarantee any group success in electing its preferred candidates. *Id.* at 979. Nor does it require that districts be configured in a way that maximizes the influence of any particular group. *Johnson v. DeGrandy*, 512 U.S. 997, 1022, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). What Section 2 does require is that members of a racial minority be given the same opportunity as other members of the electorate to elect candidates of their choice. *Voinovich*, 507 U.S. at 153, 113 S.Ct. 1149. Put another way, Section 2 leaves a state free to decide how its voting district lines should be drawn as long as the plan that is adopted does not have "the effect of denying a protected class the equal opportunity to elect its candidate of choice." *Id.* at 155, 113 S.Ct. 1149.

In single-member districts the type of dilution prohibited by Section 2, generally, takes one of two forms. The members of the group may be "dispersed" among several districts so that they do not constitute a majority in any district and/or they may be "packed" into a few districts, thereby minimizing the number of districts in which they constitute a majority. *Id.* at 153–154, 113 S.Ct. 1149.

The Supreme Court has described the evils of "dispersal" as follows:

A politically cohesive minority group that is large enough to constitute the *majority* in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a *majority*. Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented mi-

nority group will be unable to muster sufficient votes in any district to carry its candidate to victory.

*Id.* at 153, 113 S.Ct. 1149 (emphasis added).

## II. *The Plaintiffs' Claim*

In this case, the plaintiffs' claim focuses on District 2 where they allege that African–Americans have been prevented from constituting the 26% or more of the electorate that would enable them to elect candidates of their choice claiming that this aspect of the Plan "dilutes the voting strength of black voters by unnecessarily dividing those voters among several districts" (Am.Compl.¶ 29).

As *Voinovich* indicates, dispersal claims ordinarily are made by racial minority groups alleging that a plan deprives them of the majority status they otherwise would enjoy in a particular district or districts. Moreover, assessing the viability of such a claim usually requires examination of the overall impact of the plan because a plan that decreases minority voting strength in one district may increase minority voting strength in other districts. In addition, courts must be mindful of the "ripple effect" that reconfiguring the boundaries of one district may have on the boundaries of other districts and the rights of voters residing in those districts.

However, deciding the motion to dismiss in this case does not require such a broad-gauged assessment. The plaintiffs' challenge focuses on the Plan's alleged impact on the ability of African–American voters in District 2 to "elect" or "influence the election" of candidates and the plaintiffs do not contend that "but for" the Plan, African–American voters would constitute a majority in that district or any other district. Consequently, the narrow threshold issue presented is whether a claimed denial of an equal opportunity to "elect" or "influence the election" of candidates preferred by members of a racial minority group in any given voting district is cognizable under Section 2 when, even in the absence of the Plan, the members of that group would not constitute a majority in the district.

## III. *The Gingles Preconditions and the "Majority" Requirement*

In *Gingles,* the Supreme Court held that a plaintiff claiming that a multi-member voting district violates Section 2 on the ground that it "impedes the ability of minority voters to elect representatives of their choice," must satisfy three preconditions:

1. "[T]he minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."

2. "[T]he minority group must be able to show that it is politically cohesive."

3. "[T]he minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752.

The *Gingles* court explained the rationale underlying the "majority" requirement by saying:

The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim

to have been injured by that structure or practice. *Id.* at 50 n. 17, 106 S.Ct. 2752.

Although *Gingles* dealt with a challenge to a multi-member district, its preconditions are equally applicable to single-member districts. *Growe,* 507 U.S. at 40–41, 113 S.Ct. 1075. However, in *Gingles,* and on three subsequent occasions, the Supreme Court has expressly refrained from addressing whether *Gingles'* first precondition bars claims under Section 2 by groups that assert the ability to elect or influence the election of candidates even though they lack a majority. *Gingles,* 478 U.S. at 46 n. 12, 106 S.Ct. 2752; *Voinovich,* 507 U.S. at 158, 113 S.Ct. 1149; *Growe,* 507 U.S. at 41 n. 5, 113 S.Ct. 1075; *Johnson,* 512 U.S. at 1008–1009, 114 S.Ct. 2647.

In *Voinovich,* the Court indicated, in *dictum,* that *if* influence-district claims are cognizable under § 2, the "majority" precondition would have to be modified or eliminated. *Voinovich,* 507 U.S. at 158, 113 S.Ct. 1149 ("Of course, the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing [an] influence-dilution claim."). However, *Voinovich* does not indicate *whether* "influence" claims would be recognized and it provides no guidance as to what modification of *Gingles'* "majority" precondition might be required because it found that the *Voinovich* plaintiffs had failed to satisfy the third *Gingles* precondition; namely, "significant white bloc voting." *Id.*

The plaintiffs take the position that *Gingles'* "majority" precondition should be applied "flexibly" and they make two seemingly inconsistent arguments why *Gingles* should not be held to bar their claim even though they fail to allege that African–Americans would constitute a majority in any reconfigured district. Initially, they argued that their claim is based on an alleged denial of the opportunity or ability to *influence* the election of candidates and that *Gingles'* majority requirement applies only to claimed denials of the opportunity or ability to *elect* candidates. However, at oral argument, the plaintiffs described their claim as one for loss of the opportunity or ability to *elect* candidates of their choice with the help of crossover voters from other groups. The Court will consider each of those arguments, in turn.

### IV. *The Ability to Influence Claim*

As already noted, the Supreme Court has expressly refrained from deciding whether "influence" claims are viable under Section 2. The First Circuit, too, has left that question unanswered. *Barrio Uno,* 72 F.3d at 979 n. 2.

■ However, every circuit and most district courts that have addressed the issue have held that claims based on an alleged ability to influence the election of candidates are not cognizable under Section 2. *Valdespino v. Alamo Hts. Indep. Sch. Dist.,* 168 F.3d 848, 852–853 (5th Cir. 1999); *Cousin v. Sundquist,* 145 F.3d 818, 828–829 (6th Cir.1998); *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 947 (7th Cir.1988); *Skorepa v. City of Chula Vista,* 723 F.Supp. 1384, 1392 (S.D.Cal.1989); *Hastert v. State Bd. of Elec.,* 777 F.Supp. 634, 652–654 (N.D.Ill.1991). This Court agrees with those decisions for several reasons.

First, there is nothing in the wording of the statute that supports the assertion of "influence" claims. Section 2 prohibits denying members of a racial minority an equal opportunity "to *participate* in the political process and/or to *elect* representa-

258

tives of their choice." 42 U.S.C. § 1973(b) (emphasis added). If Congress had intended to make an alleged loss of the ability to *influence* electoral results actionable under Section 2, it, presumably, would have said that.

Moreover, although the plaintiffs do not frame their claim as one for denial of equal opportunity to "participate" in the electoral process, construing the term "participate" to include a claimed ability to "influence" the outcome of elections would make the statute's reference to the opportunity to "elect" superfluous. If Congress had intended "participation" to encompass the ability to "influence" electoral results, the reference to the opportunity to "elect" would serve no purpose because the ability to elect, necessarily, is included in the broader and easier to prove ability to influence. The statute's express reference to the opportunity to "elect" suggests that Congress viewed the ability to affect the outcome of elections as something separate and distinct from the ability to participate in the political process.

Second, permitting "influence" claims would be inconsistent with the plain language of *Gingles*. As the *Gingles* Court noted:

> Unless minority voters possess the *potential* to *elect* representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. 2752 (emphasis added).

Here, the plaintiffs' "influence" claim does not rest on any allegation that, "but for" the Plan, African–American voters would constitute a majority in District 2 with the power to "elect" their preferred candidates. Rather, it is predicated on the contention that the Plan deprives African–American voters of a large enough minority to *affect* the outcome of elections.[1]

Third, recognizing such "influence" claims would undermine the purposes served by *Gingles'* "majority" precondition. That precondition provides an ascertainable and objective standard for adjudicating claims that would be lacking if "ability-to-influence the election of candidates" claims were allowed. "Ability-to-influence," itself, is a nebulous term that defies precise definition. If it means only the potential to alter the outcome of an election, it provides no standard at all because a single voter can be said to have that ability. On the other hand, if it means something more, there does not appear to be any workable definition of how much more is required and/or any meaningful way to determine whether the requirement has been satisfied.

The difficulty in defining the ability to "influence" elections is compounded by the practical difficulties that would be presented in attempting to measure that ability. Electoral decisions are based on a wide range of intangible factors the nature and relative weight of which vary considerably from election to election. A voter may be influenced by matters such as the issues, party affiliation, a candidate's qualifications, a candidate's personal appeal, and so on *ad infinitum*. Consequently, voting patterns are likely to vary considerably from election to election making it virtually impossible to reliably calculate the number of minority voters that would be required in order to "influence" election results. In addition, recognizing "influence" claims by minority groups rests on the insultingly stereotypical assumption that all members

---

1. In contrast, the plaintiff's "ability-to-elect" claim, while not alleging that the Plan deprives African–Americans of majority status, does allege that, as a 26% minority, they would have the ability to "elect" their preferred candidates. *See infra* p. ——.

of a racial minority vote alike and it would encourage the kind of racial bloc voting that the VRA seeks to combat.

Even if a minority group's ability to "influence" elections could be determined with some degree of certainty, this case illustrates the Catch 22 that "ability-to-influence the election of candidates" claims would present in districts such as this one that encompass more than one racial minority. As already noted, the amended complaint alleges that the African–American population of District 2 has been reduced from 25.69% to 21.42%; the Hispanic population has increased from 41.08% to 46.74%; and the percentage of the population belonging to neither group has remained relatively constant. The amended complaint also alleges that Hispanic voters generally prefer a candidate different from the African–Americans' candidate of choice. Thus, granting the plaintiffs' request for relief and reconfiguring the district in a way that permits African–American voters "to elect representatives of *their* choice" would deny the same right to Hispanic voters who are an even larger minority. Indeed, in another case now pending in this Court, Latino voters also are challenging the Plan, partly, on the ground it dilutes their voting strength in District 2, the same district that is the subject of these plaintiffs' challenge. *See Latino Voting Rights Comm. of Rhode Island v. Inman,* C.A. No. 02–296–T (D.R.I. filed July 2, 2002).

The objective, bright-line standard supplied by *Gingles'* "majority" precondition also screens out cases having no prospect of success and that, otherwise, would flood the courts. *McNeil,* 851 F.2d at 947 ("If allowed, the 'ability to influence' claim would severely undermine whatever good purpose is served by the threshold factors. Courts might be flooded by the most marginal section 2 claims if plaintiffs had to

show only that an electoral practice or procedure weakened their ability to influence elections."). As the *Hastert* court stated, "an unrestricted breach of the *Gingles* single-district majority precondition will likely open a Pandora's box of marginal Voting Rights Act claims by minority groups of all sizes." *Hastert,* 777 F.Supp. at 654.

Fourth and perhaps most compelling, there is no sound reason why the "majority" precondition that *Gingles* has held applicable to "ability-to-elect" claims should be considered inapplicable to "ability-to-influence election" claims. On the contrary, it makes little sense to impose a stricter "majority" precondition standard to claims alleging denial of the ability to actually *elect* candidates than to claims merely alleging denial of the ability to *influence* the election of candidates. Indeed, recognizing such influence claims would effectively negate *Gingles'* majority precondition. Section 2 challenges could be made by any group whether it claimed to be a majority or not. As the *Hastert* court stated:

> [W]e are unable to perceive, as a matter of simple logic, a principled justification for waiving the minority voter majority requirement in single-member district cases while preserving it in multi-member or at-large district cases. The concerns animating the *Gingles* electoral majority precondition for multi-member cases—concerns of proof and relief—reside equally in the single-member context.

*Id.*

The plaintiffs' reliance on *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991), is misplaced for two reasons. First, *Armour* does not purport to recognize "influence" claims. On the contrary, the *Armour* court expressly refrained from addressing the viability of such claims say-

ing: "We need not reach the question of whether such an action may be viable under the Voting Rights Act because we find that the plaintiffs have met their burden of demonstrating an ability to *elect* a candidate of their choice." *Armour,* 775 F.Supp. at 1059 n. 19 (emphasis added).

Second, to the extent that *Armour* can be construed as recognizing "influence" claims, it stands for a proposition that is contrary to the overwhelming weight of authority and has been specifically rejected by the 6th Circuit that encompasses the district where *Armour* was decided. *See Cousin,* 145 F.3d at 828–829 ("We believe the district court erred in assuming from the *Gingles* footnote and the Senate Report that an influence claim is actionable under Section 2. . . . We therefore view the plaintiffs' . . . claim as an impermissible 'influence' claim, wrongly asserted under Section 2.").

## V. *The Ability–to–Elect Claim*

■ The plaintiffs' alternative argument is that their claim satisfies *Gingles'* first precondition because, even though African–Americans would constitute only a minority of residents in a properly configured District 2, with the help of "crossover" voters from other groups, they would have the opportunity to "elect" candidates of their choice. That claim amounts to nothing more than a re-labeling of the plaintiffs' influence-dilution claim, and it fails for several reasons.

First, it mischaracterizes *Gingles'* first precondition. Although the rationale for that precondition is that "but for" the challenged plan a group would have the ability to elect its preferred candidates, the precondition requires that, in order to demonstrate that ability, the group must show that it would "constitute a *majority*" in the District. *Gingles,* 478 U.S. at 50, 106 S.Ct. 2752 (emphasis added).

Second, the plaintiffs' argument distorts what is meant by the term "elect." In a democracy, candidates for political office are elected by a majority of the voters. Therefore, it is difficult to see how a group constituting less than a majority can claim the ability to "elect" a candidate. It is true that some courts have recognized that when two or more racial minorities share a common interest; and, together, vote as a cohesive majority, they may be viewed as having the ability to "elect" candidates, *e.g., Concerned Citizens v. Hardee County Bd.,* 906 F.2d 524, 526 (11th Cir.1990); *Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), but that is not what is alleged in this case. On the contrary, the amended complaint indicates that Hispanic voters in District 2 and in former District 9 are not cohesive with African–American voters in that they usually prefer different candidates.

Third, it seems incongruous to say that, because members of a group comprising a minority of voters, are unable to "elect" candidates that they prefer rather than candidates preferred by the members of a majority group, that they have been denied an *equal* opportunity to elect candidates of their choice.

## VI. *The Bloc Voting Requirement*

The plaintiffs' claim also fails to satisfy the third *Gingles* precondition; namely, that they "must be able to demonstrate that the *white majority* votes sufficiently *as a bloc* to enable it . . . usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752 (emphasis added).

In this case, there is no "white majority" in District 2 that could prevent the election of candidates of the plaintiffs' choice. Since the amended complaint alleges that the population of District 2 is 21.42% Afri-

can–American and 46.74% Hispanic, no more than 31.84% can be white.

Moreover, it is difficult to see how white voters in District 2 could be described as voting "as a bloc" to defeat the plaintiffs' preferred candidates. The plaintiffs allege that, if District 2 were reconfigured to have a population that is 26% African–American, there would be sufficient "crossover" voters to enable them to elect candidates of their choice. However, even if only half of the required "crossover" voters (i.e. an additional 12% of all voters) were white, they would constitute more than 1/3 of all white voters.[2] That two-to-one split among white voters hardly could be characterized as white "bloc voting."

### Conclusion

To summarize, plaintiffs' failure to allege that African–American voters could constitute a majority in a reconfigured District 2 and their acknowledgment that District 2 does not have a white majority are fatal to their Section 2 claim for a denial of the ability to "elect" or "influence the election" of candidates of their choice. Although that does not necessarily mean that a minority group comprising less than a majority in a voting district would be without a remedy if it could show that the district's boundaries were drawn along racial lines so as to amount to racial gerrymandering, *see Shaw*, 509 U.S. at 649, 113 S.Ct. 2816, in this case for all of the foregoing reasons the defendants' motion to dismiss is granted.

IT IS SO ORDERED,

---

2. Since approximately 32% of the District's population is white, the number of white voters required to make up the 12% of "crossovers" needed would be 12/32, or about 37%, of the white population.